■ Mark DeRosa, Respondent, v Bovis Lend Lease LMB, Inc., et al., Appellants-Respondents, Greco Bros. Ready Mix Concrete Co., Inc., Respondent-Appellant, et al., Defendants. [947 NYS2d 472]—

Order, Supreme Court, Bronx County (Alison Y. Tuitt, J.), entered on or about June 3, 2011, which, to the extent appealed from as limited by the briefs, denied the cross motion of defendants-appellants for summary judgment dismissing plaintiff's Labor Law § 240 (1) claim, and granted plaintiff's motion for partial summary judgment on the issue of liability on his section 240 (1) cause of action, reversed, on the law, without costs, plaintiff's motion denied and appellants' cross motion granted.

Plaintiff, the driver of a cement-mixing truck, was directed by the property owner's contractors and construction manager, to position his cement truck side-by-side with another cement truck so that the two trucks could simultaneously pour their cement into a hopper. The space plaintiff was directed to occupy afforded him a foot or less of leeway on either side of his truck in which to operate. The spacing was significant since plaintiff needed at least two feet on the truck's rear to unfold a two-foot extension attached to a metal ladder that was affixed to the truck. The ladder enabled the driver to climb up to the top of the truck in order to evaluate the consistency of the cement in the truck's mixing barrel prior to pouring the cement mix.

After plaintiff parked his truck, he went to the rear of his truck and activated switches that put the truck's mixer at full speed. He then mounted the right side of the truck's rear fender, which was approximately three feet off the ground, and knelt down to reach around to the rear side of the truck to activate a water-mixing valve. As plaintiff began to stand and lift his leg around to the right in an effort to ascend the truck's unextended ladder, the back of his shirt became caught in the mixer's rotating hatch handle, causing him to be propelled upward and over to the other side of the truck.

Dismissal of plaintiff's Labor Law § 240 (1) cause of action is warranted. Contrary to the dissent's assertion, we are fully cognizant that section 240 (1) is to be liberally construed (*see Harris v City of New York*, 83 AD3d 104, 108 [2011]). However, such liberality "should be construed with a commonsense approach to the realities of the workplace at issue" (*Salazar v Novalex Contr. Corp.*, 18 NY3d 134, 140 [2011]). The protections of the statute "are not implicated simply because the injury is caused by the effects of gravity upon an object" (*Melo v Consolidated Edison Co. of N.Y.*, 92 NY2d 909, 911 [1998]). Rather, the question is "whether the harm flows directly from the application of the force of gravity to the object" (*Runner v New York Stock Exch., Inc.*, 13 NY3d 599, 604 [2009]). Stated differently, the "single decisive question is whether plaintiff's

injuries were the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential" (*Runner*, 13 NY3d at 603).

Here, the record demonstrates that plaintiff was not exposed to an elevation-related risk and his injury did not directly flow from the application of gravity's force (*see Toefer v Long Is. R.R.*, 4 NY3d 399, 408 [2005]; *Medina v City of New York*, 87 AD3d 907, 909 [2011]). Rather, plaintiff's accident arose from activities and circumstances that arise on a construction site and are not covered by section 240 (1)'s elevation-differential protections (*see Toefer*, 4 NY3d at 407).

Plaintiff failed to establish that the circumstances, at the time of his injury, warranted the protection of the type of safety equipment enumerated in section 240 (1) (*see Berg v Albany Ladder Co., Inc.*, 10 NY3d 902, 904 [2008]; *compare D'Alto v 22-24 129th St., LLC*, 76 AD3d 503, 506 [2010]). Side-by-side pouring of concrete, although apparently not a routine method of delivery, was not unknown to either plaintiff or defendants. Plaintiff testified that he made such deliveries on a "handful" of other occasions and made no complaints about such practice prior to his injury, despite the fact that he never received any training on how to make such deliveries. Under these circumstances, the "realities of the workplace at issue" do not implicate the protections of the statute (*Salazar*, 18 NY3d at 140).

Nor do the holdings in *Runner v New York Stock Exch., Inc.*, (13 NY3d 599 [2009], *supra*) and *Wilinski v 334 E. 92nd Hous. Dev. Fund Corp.* (18 NY3d 1 [2011]), as cited by the dissent, compel a different result. In *Runner*, the plaintiff was injured while using a makeshift system of lowering a heavy reel of steel wire down four stairs (13 NY3d at 602). In *Wilinski*, the plaintiff was injured when unsecured pipes that extended above his work location fell on him during demolition of a wall enclosing those pipes (18 NY3d at 5). In each case, the plaintiff's injury was the direct result of the failure to provide safety devices of the type enumerated in the statute.

Simply put, "the protections of Labor Law § 240 (1) do not apply to every worker who falls and is injured at a construction site" (*Berg*, 10 NY3d at 904). Indeed, as the dissent acknowledges, plaintiff testified that his delivery work did not require that he be provided with any safety equipment from the owner or general contractor. The dissent's position is therefore an unwarranted extension of the statute. Concur—Friedman, J.P., Sweeny, DeGrasse and Román, JJ. Renwick, J., dissents in a memorandum as follows:

Renwick J. (dissenting). In this personal injury action, plaintiff's Labor Law § 240 (1) claim arises out of an accident that took place when he was attempting to make a concrete delivery to a work site, which defendant owner was converting into cooperative apartments. Plaintiff was climbing the cement truck, to visually assess whether the consistency of the mix was appropriate for the specifications of the job, when a lever from the rotating barrel of the cement truck caught plaintiff and literally threw him, like a cannonball, over the top of the truck and into the side of the street that had been left open for vehicular traffic.

Based upon these remarkable but undisputed facts, Supreme Court granted plaintiff's motion for partial summary judgment on the issue of liability on his Labor Law § 240 (1) claim. The majority of this Court, however, now reverses and grants defendants summary judgment dismissing the Labor Law § 240 (1) claim on the grounds "that plaintiff was not exposed to an elevation-related risk and his injury did not directly flow from the application of gravity's force." I disagree with the majority's astonishing conclusion and, instead, find that plaintiff's injuries "were the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential" (*Runner v New York Stock Exch., Inc.*, 13 NY3d 599, 603 [2009]). I must therefore dissent.

Background

The facts of this case are essentially undisputed. Plaintiff's accident occurred on April 11, 2006, at a construction site located on the corner of 81st Street and Fifth Avenue in Manhattan and owned by defendant 995 Fifth Avenue LLC. The owner hired defendant Bovis Lend Lease LMB, Inc. as construction manager. The project consisted of the transformation of the former Stanhope Hotel into cooperative apartments. Defendant RCC Concrete Corp. (RCC) was the concrete contractor for the project. Defendant Greco Bros. Ready Mix Concrete Co., Inc. and nonparty Elite Ready Mix Corp. (Elite) were related corporations that principally produced and delivered concrete.

Plaintiff was trained as a cement truck driver and had three years of experience driving the cement truck at issue for Elite. Plaintiff's job as the driver/operator of a cement truck entailed on-the-site mixing of the cement. He was required to open a valve located near the rear of the driver's side of the truck in order to release the desired amount of water into the concrete. The water and concrete would then typically take approximately eight to ten minutes to mix. During the period in which the concrete and water mixed, he was supposed to climb up to "the

top of the truck," lean into the "load chute," and "[l]isten and look" at the mix. He was trained to tell the consistency of the concrete both by sight and by "the sound of mixed concrete in the barrel." The truck itself was 11½-to-12-feet high. Plaintiff had been provided a "fold down ladder" in order to observe the load chute. The ladder was affixed near the rear of the driver's side of the truck.

Prior to his accident, he had made two deliveries to the site, once on the morning of the accident and once during the prior week. On neither of the prior deliveries was the area set up for side-by-side cement deliveries. On each of the prior deliveries, plaintiff had backed the truck to the hopper when directed to do so by the RCC Concrete flag person, dumped the cement, washed the truck out, and then returned to his employer's plant, all without incident.

On the day of the accident, plaintiff's first delivery of cement to the construction site was uneventful. On his second trip to the construction site, plaintiff had to wait in line to deliver his cement because two other cement trucks were ahead of his truck, and they were positioned "side-by-side" to allow them to simultaneously dispense their cement into a "hopper." From the hopper, the cement was pumped towards the building and used to pour the building's first and second cement floors.

In order for the two cement trucks to simultaneously pour their cement without interfering with the flow of traffic on 81st Street (which was a westbound street having only three lanes), each truck occupied one traffic lane, side-by-side, in the two lanes located nearest the building (i.e., on the south side of 81st Street). The third lane, which was furthest from the building (on the north side of the street), was left open for traffic. The two southerly lanes on 81st Street were cordoned off by movable metal barriers. The hopper was positioned near the corner of 81st Street and 5th Avenue (in front of the renovated building), and the cement trucks would park just east of the hopper on 81st Street, with the rear of the trucks facing west, towards the hopper and 5th Avenue.

Once one of the two cement trucks finished dumping its cement, an RCC flag person motioned for plaintiff to back his cement truck into the spot formerly occupied by the departing cement truck. That spot was the middle traffic lane on 81st Street. The truck that remained, and was still delivering cement, occupied the southerly lane of 81st Street (abutting the curb). Once plaintiff backed into the middle lane and parked, he noted that he had eight inches of space between his truck and the truck parked to his right. On the left side of his truck, plaintiff

noted there was approximately one foot of space between his truck and the barrier fence that separated the work space on 81st Street from the open traffic lane on the north side of 81st Street.

Plaintiff exited the driver's side of his truck (i.e., the truck cab's right side, which is the opposite of an automobile). Plaintiff then walked around the front of his truck, towards the passenger side, and then towards the rear of his truck, via the one-foot space that existed between his vehicle and the barrier fencing. Plaintiff had no problem getting to the back of his truck along the barrier fence. Once at the back of the truck, plaintiff pressed switches that activated the cement mixer to operate at full speed. Plaintiff then climbed onto a 20-inch-high bumper to access the truck's 36-inch-high back fender. Plaintiff mounted the back fender to reach a water-mixing valve located on the right side of his truck (i.e., the driver's side).

Once on the fender, plaintiff knelt down to reach the water valve located near the truck's right side. Plaintiff activated the water valve and proceeded to stand back up while still on the rear fender. His intent was to then move to his left in order to mount a ladder which was affixed to the truck's right side, towards the rear. The rear ladder and the water valve were located right next to each other. The ladder would have allowed him to ascend to the top of the truck so that he could evaluate the consistency of the cement mixture. However, as plaintiff stood from his kneeling position on the back fender, and started to move his feet towards the ladder, the lever of the rotating hatch caught onto his shirt and propelled him upward and over the top of the cement truck, into the open lane of traffic. Plaintiff landed about five feet from his truck. He never set foot on the side ladder before he was catapulted over the top of the truck.

Plaintiff was unable to drop the extension piece of the truck's rear ladder down to the street level—to enable him to climb from the ground to the top of the 12-foot high truck to check the cement's consistency—due to the limited eight-inch space between the two trucks. Plaintiff explained that the ladder's extension piece was 24 inches long, and had to be unfolded, outwardly, away from the truck, and then down to the ground. As for safety equipment, plaintiff noted that his delivery work did not require that he be provided with any safety equipment from the owner or general contractor. He did not receive instructions from anyone at the project on how to make his delivery, apart from the RCC flag person who directed him to back into the middle traffic lane and to dispense his cement side-by-side

with another truck. Plaintiff had only made "side-by-side" deliveries of cement on a "handful" of occasions in the past. He never received any training on how to do side-by-side pours.

Elite's principal, Joseph Greco, testified at his deposition that in his six or seven years ("on and off") of making concrete deliveries, he had never heard of, or witnessed, side-by-side deliveries of concrete. Greco opined that side-by-side deliveries would tend to block traffic and limit the operating space of the truck driver, potentially preventing the driver from accessing portions of the truck.

Bovis's Senior Superintendent at the project, John McGillicuddy, testified at his deposition that he had seen side-by-side deliveries of concrete, but could not recall the frequency that such practice was utilized. RCC Concrete Superintendent Darren Jonoski testified that he made the decision as to side-by-side deliveries, and that such delivery practice was a "common" one.

In September 2008, plaintiff commenced this personal injury action and asserted two causes of action—namely, common law negligence and violations of the Labor Law (§§ 200, 240 [1]; § 241 [6]). Plaintiff moved for partial summary judgment as to liability on his Labor Law § 240 (1) claim. The owner and general contractor opposed the motion and cross moved for summary judgment dismissing the claims against them. While denying defendants' cross motion, the court granted plaintiff's motion to the extent of finding that plaintiff presented evidence to show he was engaged in work covered by Labor Law § 240 (1), inasmuch as his cement delivery work was in furtherance of the building's renovation, and that he "f[e]ll and sustain[ed] serious personal injuries" while performing his duties.* This appeal followed.

Analysis

Contrary to the majority's determination, I find that the motion court properly granted plaintiff's motion for partial summary judgment on his Labor Law § 240 (1) claim. That section, more commonly referred to as the Scaffold Law, provides that "[a]ll contractors and owners and their agents . . . in the erection, demolition, repairing, altering . . . of a building or structure shall furnish or erect, or cause to be furnished or

---

* The court, having granted plaintiff summary judgment on his Labor Law § 240 (1) claim, "decline[d] to consider" defendants' argument that they are entitled to summary judgment dismissing plaintiff's claims, inasmuch as the "damages" sought on each of the claims were "the same regardless of the theory of liability," and the court's decision rendered such other claims "academic." Defendant did not appeal from this determination.

erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed."

To establish liability under Labor Law § 240 (1), a plaintiff must demonstrate both that the statute was violated and that the violation was a proximate cause of injury; the mere occurrence of an accident does not establish a statutory violation (*see Blake v Neighborhood Hous. Servs. of N.Y. City*, 1 NY3d 280 [2003]).

The majority's argument that plaintiff's accident is outside the scope of section 240 (1) because it resulted from a usual and ordinary danger of a construction site is unpersuasive. The majority argues that the reality of the work place "d[id] not implicate the protections of the statute" because "[s]ide-by-side pouring of concrete, although apparently not a routine method of delivery, was not unknown to either plaintiff or defendants." However, whether plaintiff was aware that side-by-side pouring was going to take place is of no moment. Rather, as the recent Court of Appeals holdings in *Runner v New York Stock Exch., Inc.* (13 NY3d 599, 603 [2009]) and *Wilinski v 334 E. 92nd Hous. Dev. Fund Corp.* (18 NY3d 1 [2011]) made abundantly clear, the proper question is whether a safety device of the kind enumerated in section 240 (1) was necessary to guard plaintiff from the risk of a physically significant elevation differential.

A brief review of the facts of *Runner* and *Wilinski* is necessary to dispel the notion the majority has that the "dissent's position is . . . an unwarranted extension of the statute." In *Runner*, the plaintiff and several coworkers had been directed to move an 800-pound reel of wire down a set of four stairs. To prevent the reel from rolling down the stairway, they had been instructed to tie one end of a 10-foot length of rope to the reel, and then to wrap the rope around a metal bar that was placed horizontally across a door jamb at the top of the stairway. The plaintiff and two coworkers held the rope to anchor the reel, while two other workers began to push the reel down the stairs. As they moved the reel, the plaintiff, who was "essentially acting as [a] counterweight[ ]" to the reel, was pulled toward the bar. He was ultimately pulled into the bar, and struck his hands against it. It was alleged that a pulley should have been used, instead of the makeshift rope system (13 NY2d at 602).

The Court was asked to determine whether liability could be imposed under Labor Law § 240 (1), even though the worker had not fallen and was not struck by a falling object. The Court

held that the applicability of the statute was not dependent on whether the injury resulted from a fall, either of the worker or an object upon the worker. Rather, the decisive issue was whether the plaintiff's injuries "were the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential" (*Runner*, 13 NY3d at 603).

Likewise, more recently, in *Wilinski* (18 NY3d 1 [2011], *supra*) the Court of Appeals, consistent with *Runner*, rejected any bright-line rule on whether the injury resulted from a fall, either of the worker or an object upon the worker. In *Wilinski*, the plaintiff was demolishing brick walls at a vacant warehouse. Previous demolition of the ceiling and floor above had left two metal, vertical plumbing pipes unsecured. The pipes were approximately 10 feet high and rose out of the floor on which the plaintiff was working. No measures had been taken to secure the pipes. While the plaintiff was working, the pipes were struck by debris and toppled over, injuring plaintiff. The plaintiff moved for summary judgment under Labor Law § 240 (1). (*Wilinski*, 18 NY3d at 5-6.)

The specific issue before the Court of Appeals was whether plaintiff had a claim under section 240 (1) even though he and the pipes were at the same level at the time that the pipes collapsed. The Court found that this factor was not dispositive. Instead, the correct analysis should be whether a device of the type enumerated in Labor Law § 240 (1) should have been used to protect against elevation-related risk during the performance of a task covered by the statute. The Court observed that the plaintiff had demonstrated not that the kinds of protective devices enumerated in the statute, such as ropes or blocks, could have been used to secure the pipes and prevent the accident. The Court ultimately held that there was a question of fact as to whether the plaintiff's injury resulted from the lack of a safety device of the type enumerated in the statute (*Wilinski*, 18 NY3d at 9-11).

As in *Runner* and *Wilinski*, this case contains the necessary conditions for the applicability of section 240 (1), i.e., an elevation-related risk of the kind that the safety devices listed in section 240 (1) protect against. Plaintiff's job required him to complete the mixing of the concrete at the site itself. He performed this task by operating a water valve switch that was located on the rear of the driver's side of his truck. Plaintiff was also required to climb to the top of the truck so that he could visually assess whether the consistency of the mix was appropriate for the specifications of the job. The truck was equipped

with a ladder, located on the rear of the driver's side of the truck, for this task.

Under the circumstances, it cannot be seriously disputed that a device of the type enumerated in Labor Law § 240 (1) should have been used, during the performance of a task covered by the statute, where plaintiff was required to perform a job-related task from a physically significant elevation differential. Indeed, a device precisely of the sort enumerated by the statute was provided for use during the performance of the task covered by the statute. Specifically, the truck was equipped with a ladder, located on the rear of its driver's side, which was intended to be used as the barrel mixed concrete and for that obvious reason was "placed" so as to swing out and away from the barrel. Thus, the ladder—which would normally be used to access a different elevation, was "indisputably" the type of device triggering the statute (*Megna v Tishman Constr. Corp. of Manhattan*, 306 AD2d 163, 164 [2003]; *see also McGarry v CVP 1 LLC*, 55 AD3d 441, 441 [2008]; *Bush v Goodyear Tire & Rubber Co.*, 9 AD3d 252 [2004]; *Oliveira v Dormitory Auth. of State of N.Y.*, 292 AD2d 224 [2002]).

Nor can it be seriously disputed that the accident was caused by the elevation risk that the ladder was intended to guard against. All defendants had to do was to provide adequate space for plaintiff to use the safety device his employer had provided. However, they, not he, decided that they wanted the concrete delivered by the "faster" side-by-side method. Although the majority ignores the risk posed by such method, the majority cannot dispute the fact that by physically preventing plaintiff from "placing" the ladder in the manner it was supposed to be "placed," defendants exposed plaintiff to distinct "elevation-related" hazards. One risk was that plaintiff might fall while contorting himself in trying to access the valve or the ladder. It was also very likely that plaintiff would strike one of the trucks as he fell to the ground, since they were only eight inches apart. The barrel of the adjacent truck presented a risk since it was rotating during the process of delivering cement. The other risk was that which actually occurred—namely, that plaintiff could accidently come in contact with the hatch of the rotating cement barrel. Thus, plaintiff has shown that defendants failed to provide him with an adequate safety device to shield him from harm, and defendants point to no evidence in opposition that would create an issue of fact.

That the accident happened under remarkable circumstances—a lever from the rotating barrel of plaintiff's cement truck catches him and literally catapults him, like a cannonball,

over the top of his truck—is of no moment. Indeed, the Court of Appeals has held that in order to make out a valid claim under Labor Law § 240 (1), "[a] plaintiff need not demonstrate the precise manner in which the accident happened" (*Gordon v Eastern Ry. Supply*, 82 NY2d 555, 562 [1993]). Rather, the key is whether plaintiff was injured when an elevation-related device failed to perform its function to support and secure him from injury (*see Morin v Machnick Bldrs.*, 4 AD3d 668, 670 [2004]). Thus, since plaintiff was required to use the truck's fender as an ersatz ladder, and his injury was caused when he fell off the makeshift device, this claim was one of the gravity-related hazards or perils that the ladder was intended to guard against.

To hold that this accident does not invoke the Scaffold Law ignores clear precedent from this Court. We have consistently held, under analogous circumstances, that a temporary staircase serving as the functional equivalent of a ladder to access different levels of the work site, is the type of elevation-related risk the statute was intended to cover (*see e.g. Megna v Tishman Constr. Corp. of Manhattan*, 306 AD2d 163 [2003], *supra* [a worker was injured when a temporary two-step staircase leading to a temporary wooden landing collapsed, causing him to fall to the floor]; *McGarry v CVP 1 LLC*, 55 AD3d 441, 441 [2008], *supra* ["makeshift staircase (unsecured cinder blocks) was being used as access to different levels of the work site"]; *see also Bush v Goodyear Tire & Rubber Co.*, 9 AD3d 252 [2004], *lv dismissed* 3 NY3d 737 [2004] [while plaintiff was atop the dumpster, attempting to level the debris inside, his arm hit a wire and he fell to the ground]).

Defendants' arguments attempting to circumvent the plain meaning of, and the strict liability imposed by, the statute do not survive close scrutiny. For instance, there is no merit to defendants' contention that this case does not give rise to liability under Labor Law § 240 (1) because, essentially, it does not present the type of elevation risk envisioned in the statute. Defendants' and the majority's reliance on *Toefer v Long Is. R.R.* (4 NY3d 399 [2005]), in support of this contention, is misplaced. In *Toefer*, the Court held that "[a] four-to-five-foot descent from a flatbed trailer or similar surface does not present the sort of elevation-related risk that triggers Labor Law § 240 (1)'s coverage" (*id.* at 408).

*Toefer* is readily distinguishable from this case. The working position of plaintiff here is clearly a discernible difference because standing on a fender to access yet another level is not such an ordinary practice as stepping down from a flatbed truck.

Instead, plaintiff should have been on the ladder that his employer had provided.

Indeed, in *Ortiz v Varsity Holdings, LLC* (18 NY3d 335 [2011]), the Court of Appeals recently relied upon this factual distinction in making *Toefer* and its progeny inapplicable to the case. In *Ortiz*, the plaintiff was injured when he was taking debris from a building under demolition and placing it in a dumpster outside. The dumpster was about six feet high, eight feet wide, and fourteen feet long. The ledge at the top of the dumpster was about eight inches in width. Plaintiff climbed up, using footholds built into the side, and began to rearrange the debris inside to make more room. It started to rain, making the surface of the dumpster slippery. Ortiz was injured when, while holding a wooden beam and standing at the top of the dumpster, with at least one foot on the narrow ledge, he lost his balance and fell to the ground (18 NY3d at 338).

In distinguishing *Ortiz* from *Toefer* and its progeny, the Court of Appeals held that the working position of Ortiz was distinguishable from that of the worker in *Toefer*. In *Toefer*, the Court explained, the plaintiff was simply stepping down from a flatbed truck. He, therefore, encountered "the usual and ordinary dangers of a construction site," from which he, "may reasonably be expected to protect himself by exercising due care" (18 NY3d at 399 [internal quotation marks omitted]). By contrast, in *Ortiz*, the worker was required to climb a dumpster, and the defendant failed to demonstrate that the worker's position on the ledge was unnecessary or that no safety device of the kind enumerated in section 240 (1) would have prevented the plaintiff's fall. Similarly, here, defendants have failed to show that standing on the truck's fender was unnecessary—plaintiff had no other choice because the ladder was blocked.

Finally, there is no plausible view of the evidence that plaintiff's own acts or omissions were the sole proximate cause of the accident (*cf. Weininger v Hagedorn & Co.*, 91 NY2d 958, 960 [1998]; *see also Vergara v SS 133 W. 21, LLC*, 21 AD3d 279, 281 [2005]). Contrary to defendants' allegations, "[t]his is not a situation where a plaintiff, on his own initiative, took a foolhardy risk which resulted in injury" (*Harris v City of New York*, 83 AD3d 104, 110 [2011]; *cf. Montgomery v Federal Express Corp.*, 4 NY3d 805 [2005]). Indeed, while defendants argue that plaintiff, as driver, had full authority over his truck, including how to park it, and that he could have angled the truck in the middle lane so as to allow him to fully extend the truck's rear ladder, those assertions are not supported by the evidence. The record undisputably reflects that the RCC flag person directed

plaintiff into the middle lane, side-by-side with another cement truck, and that there was less than a combined two feet of space on the sides of the truck in which to maneuver. Plaintiff was left to attempt to access the truck's raised rear ladder from the back fender. Hence, as a matter of fact and law, plaintiff cannot be the sole proximate cause of his injuries (*see Pichardo v Aurora Contrs., Inc.*, 29 AD3d 879 [2006] [the plaintiff was not the sole proximate cause of his injury where the evidence showed that at the time of injury, he was acting pursuant to the directions of his supervisor]).

For the reasons discussed above, I would affirm the grant of plaintiff's motion for partial summary judgment on the issue of liability on his Labor Law § 240 (1) cause of action.